UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


DEBORAH G. FRAME,

    Plaintiff,

v.                        Case No. 8:16-cv-2299-T-33AAS

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,

    Defendant.

_____/

## ORDER

    This matter comes before the Court upon consideration of
two cross-Motions for Summary Judgment: (1) Defendant Hartford
Life and Accident Insurance Company's Dispositive Motion for
Summary Judgment with Statement of Undisputed Facts, filed on
March 13, 2017 (Doc. # 22), Plaintiff Deborah Frame's
Response, filed on April 12, 2017 (Doc. ## 25, 26), and
Hartford's Reply, filed on April 26, 2017 (Doc. # 29); and (2)
Plaintiff's Motion for Summary Judgment, filed on March 13,
2017 (Doc. # 24), Hartford's Memorandum in Opposition, filed
on April 13, 2017 (Doc. # 28), and Plaintiff's Reply, filed on
April 26, 2017 (Doc. # 30). On June 12, 2017, Hartford filed
a Notice of Supplemental Authority, <u>Prelutsky v. Greater Ga.
Life Ins. Co.</u>, No. 16-15900, ___ F. App'x ___, 2017 WL 2406730
(11th Cir. June 2, 2017). (Doc. # 31). For the reasons that
follow, Hartford's Motion for Summary Judgment is **GRANTED** and
Plaintiff's Motion for Summary Judgment is **DENIED**.

## I. __Background__

At 9:00 p.m. on September 2, 2015, Ordeth Frame was fatally injured in a single-car collision in Bradenton, Florida. (H1926, H1208).[1] Frame's car traveled off University Parkway, struck at least one tree, and rolled over. (H1926, H1208). Frame was transported by ambulance to Lakewood Ranch Medical Center, where he was pronounced dead at 10:04 p.m. (H1926). The autopsy report listed cause of death as blunt impact injuries to the head, neck, torso, and extremities. (H1928).

At the time of the accident, Frame was insured under an Accidental Death and Dismemberment Policy through his employer, which was issued by Defendant Hartford. (H54-H55). On September 22, 2015, Plaintiff, who is Frame's wife, submitted a claim under the policy for the principal sum of $500,000. (H2276-H2281). On October 19, 2015, Hartford denied the claim. (H2284). The instant action, which is brought pursuant to the Employee Retirement Income and Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), turns on whether Hartford lawfully denied benefits under the policy.

In denying Plaintiff's claim, Hartford invoked the policy's intoxication exclusion, which states that the policy "does not cover any loss caused or contributed to by . . .

---

[1] Citations to "H####" refer to the administrative record, which is filed at Doc. # 23.

Injury sustained while Intoxicated." (H66-H67). The policy defines "Intoxicated" as follows:

> **Intoxicated** means:
> 1) the blood alcohol content;
> 2) the results of other means of testing blood alcohol level; or
> 3) the results of other means of testing other substances;
> that meet[s] or exceed[s] the legal presumption of intoxication, or under the influence, under the law of the state where the accident occurred.

(H67). Hartford relied on Frame's autopsy report, which listed his blood alcohol level as 0.149 gm/dL. (H2284, H1928). Under Florida law, a blood alcohol level of 0.08 or higher yields a legal presumption of "under the influence." See Fla. Stat. § 316.1934(2)(c).

On March 28, 2016, Plaintiff appealed Hartford's decision and submitted several new documents. (H793-H796). Key evidence included affidavits from Frame's financial advisor, Marjorie DeCanio, and her husband Ron DeCanio, who dined with Frame just before the accident. (H794). According to the DeCanios, when they met Frame at approximately 6:45 p.m., "there was no indication whatsoever that [Frame] had consumed any alcohol prior to dinner." (H798, H801). While at the restaurant, Frame drank water and two glasses of Chardonnay wine "in a small standard wine glass," and he ate Chinese food and sushi. (H798, H801). The DeCanios averred that Frame exhibited no indication that he was impaired when he left the

restaurant: his speech was fluent, his eyes were not bloodshot or glassy, his balance was not impaired, and they smelled no alcohol on his breath. (H799, H802). The dinner ended between 8:30 p.m. and 8:45 p.m., approximately 15 to 30 minutes before the accident. (H798-H799, H801-H802).

Plaintiff's second piece of key evidence was a 19-page report from Stefan Rose, M.D., a forensic toxicologist. (H795, H1579-H1597). Dr. Rose opined that based on Frame's weight of 225 pounds, Frame would have needed to consume ten glasses of wine at dinner in order to achieve a blood alcohol level of 0.149 gm/dL, and assuming that Frame consumed only two glasses of wine, his blood alcohol level should have been 0.04 gm/dL or lower. (H1596). Dr. Rose concluded that the blood alcohol level listed in the autopsy report was "erroneous, inaccurate and unreliable for more than twenty forensic reasons." (H1582). Those reasons are summarized below.

First, Dr. Rose observed that the hospital at which Frame's blood was tested, Sarasota Memorial Hospital ("SMH"), possesses only a clinical accreditation, not a forensic accreditation. (H1583). Dr. Rose also observed that the blood sample lacked an official chain-of-custody document in violation of SMH's own policies, and the evidence label on the blood sample was not placed over the top of the tube, also in violation of SMH policy. (H1584).

Second, Dr. Rose raised questions about the source of the blood sample. The sample was described as a "peripheral" blood sample, but it did not identify the anatomical source or specify whether it was arterial or venous blood. (H1585, H1587). Dr. Rose opined that this was critical information because arterial blood has a 40% or higher ethanol concentration than venous blood during alcohol absorption, and there also is a potential for a large variation in blood alcohol level between anatomic sites. (H1585-H1589). According to Dr. Rose, multiple blood samples should have been tested, which SMH failed to do. (H1586, H1589).

With respect to the blood sample itself, Dr. Rose stated that testing "detected the products of fermentation," as evidenced by two extra volatile organic compound peaks in the chromatograms that were not present in the quality-control chromatograms. (H1588, H1596). In addition, the blood sample appeared to have been stored in a grey stopper tube, a type of tube that contains less than the recommended amount of a preservative that prevents fermentation. (H1588-H1589). In light of these issues, Dr. Rose maintained that SMH should have done further testing to determine the validity of the sample. (H1588-H1589).

Dr. Rose next questioned SMH's testing methods. SMH used two tests: enzyme assay testing and single-column headspace gas chromatography with flame ionization detector. (H1590).

Dr. Rose explained that enzyme assay testing is not approved for forensic use, and it is particularly unreliable for traumatic "crush" injuries such as Frame's because the crushing produces extra lactate that in turn raises the levels of the tested enzyme. (H1590). With respect to the gas chromatography test, Dr. Rose stated that he was not aware of any forensic lab using single-column gas chromatography; rather, dual-column gas chromatography with mass spectrometry is "the gold standard" for blood alcohol testing. (H1590-H1591, H1596). And as a general matter, Dr. Rose maintained that post-mortem blood testing does not necessarily predict the blood alcohol level at the time of death due to various factors including medication and fluid administration, trauma, and the possibility that wine from the stomach could contaminate the blood sample. (H1587, H1595-H1596).

Finally, Dr. Rose questioned the validity of the test result. Dr. Rose opined that the chromatograms displayed asymmetric peak shapes and significant tailing, rendering them unreliable and "a cause of inaccurate quantitation (measurement of the amount of ethanol in the blood sample)." (H1591-H1592, H1596). Dr. Rose also asserted that SMH intentionally deleted potentially relevant data from the blood sample, as evidenced by the notation, "Small Noise Peaks Clipped." (H1591). Dr. Rose further noted that the test result lacked an uncertainty measurement, rendering it unreliable. (H1594-H1595).

In addition to Dr. Rose's report, Plaintiff submitted records from Manatee County Emergency Medical Services ("EMS"), the emergency responders at Frame's accident scene. (H795). Manatee County EMS estimated that Frame's car was traveling at 50 miles per hour. (H1208). That estimate conflicted with a statement in an investigation report completed by Abby Andrus, the Chief Investigator for the District Twelve Medical Examiner. (H1926-H1927). Andrus reported that Corporal Carroll at the Florida Highway Patrol ("FHP") estimated that Frame was traveling 80 miles per hour in a 45-mph zone while attempting to pass a vehicle on the right side. (H1926). Corporal Carroll stated that there were no signs of braking or evasive maneuvers and no adverse road conditions, although he also observed that the road was not well-lit and had no street lights. (H1927).

A separate section in Andrus's report noted that there was "[n]o obvious odor of [alcohol]," without identifying the source of that observation. (H1925). Corporal Carroll reported that "wine was discovered on scene" and "intoxication was suspected."[2] (H1927). Andrus herself spoke with Frame's sister, who described him as an alcoholic. (H1927).

---

[2] Hartford's summary-judgment filings repeatedly state that there was wine in Frame's car. (Doc. # 22 at 13, 15; Doc. # 28 at 14 n.7, 15 n.8). Hartford points to no evidence to support that statement.

7

After Hartford received Plaintiff's appeal and supporting documents, Laurie Tubbs, the appeals specialist, sent the file back to the original claims examiner, Jeffrey Seltzer, to review the new information. (Doc. # 24 at 6-9; H549). Seltzer and a supervisor characterized the evidence as "an abundance of paper" with no new medical information, only Dr. Rose's "opinion." (H513-H514). After Plaintiff contacted Hartford to demand that the information be independently reviewed as an appeal, consistent with Plaintiff's March 28, 2016 letter, Hartford informed Plaintiff that it would treat the matter as an appeal. (H509, H513-H515).

During its review, Hartford requested that two independent physicians opine on the reliability of Frame's blood alcohol test result. (H436-437, H502-503). Through a third-party vendor, Hartford first retained Ronald Wright, M.D., a board-certified forensic pathologist. (H454, H111). Dr. Wright concluded that Dr. Rose's opinion was "completely incorrect" and that the blood alcohol test was reliable. (H466-H469). However, Plaintiff raised concerns about Dr. Wright's history, including several allegations of misconduct during his tenure as the Broward County Medical Examiner. (H454-H457). Hartford informed Plaintiff that "a quality review is occurring at the vendor and the report that has been received is not a complete report. Therefore, Hartford will not be relying on this report." (H430).

Using a different third-party vendor, Hartford then retained Richard Tovar, M.D., a board-certified physician in emergency medicine with a sub-specialty certificate in medical toxicology. (H171, H117). Plaintiff repeatedly requested that Dr. Tovar and Hartford speak directly with Dr. Rose, but Dr. Rose refused to speak with Dr. Tovar unless Plaintiff's counsel was present. (H148, H168, H192-H193, H252). Hartford then instructed Dr. Tovar to communicate with Dr. Rose in writing, which Dr. Tovar did by submitting written questions to Dr. Rose. (H148, H153-H156, H168). Dr. Rose's answers to the questions largely incorporated and re-stated the opinions in his original report. (H153-H156).

After reviewing Dr. Rose's report and supplemental answers, as well as Frame's records, Dr. Tovar issued a four-page opinion concluding that Frame's blood result "can be considered reliable." (H170). In brief, Dr. Tovar opined that "[t]he methods by which the blood ethanol specimen was obtained [were] well within reasonable standard practice for medical toxicology to be able to opine on one aspect of the presence of clinical intoxication," and that "[t]here is no evidence that there was significant postmortem alterations of the resultant blood ethanol level such as putrefaction, incorrect sample identification, incorrect lab hardware analysis, or inappropriate location of specimen tissue areas or other interfering substances." (H170-H171). Dr. Tovar

9

further opined that "the blood sample analysis was a trusted clinical level," and that "these blood ethanol tests are also commonly used by medical toxicologists and pathologists to opine on the cause and manner of death in medical toxicology." (H170). Dr. Tovar concluded as follows:

> The combination of the observed results of the vehicle crash, witness reports of Mr. Frame drinking ethanol in a time period proximal to the crash, and the presence of ethanol in his system all correlate with my opinion, made to a reasonable degree of medical certainty, that the decedent was intoxicated with ethanol at the time of the crash. Furthermore, the use of ethanol was a significant factor in the crash and the fatal results.

(H171).

By letter dated June 24, 2016, Hartford notified Plaintiff that the initial denial would stand. (H111). The letter recounted the findings in the autopsy report, Andrus's investigation report for the Medical Examiner, the DeCanios' statements about their dinner with Frame, as well as the opinions of Dr. Rose, Dr. Wright, and Dr. Tovar. (H112-H120). Hartford acknowledged Plaintiff's argument, based on the opinion of Dr. Rose, that the blood alcohol test was not reliable, but Hartford determined that "per review we find the result of a BAC of 0.149 can be considered reliable." (H120).

On August 11, 2016, Plaintiff filed the instant action pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B), to recover benefits under the policy. (Doc. # 1). Plaintiff requests a "Supplemental" principal sum of $585,000 and an additional

benefit for "Seat Belt and Air Bag Coverage" in the amount of $15,000, for a total amount of $600,000. (Doc. # 24 at 22; H56). On March 13, 2017, the parties filed their respective Motions for Summary Judgment (Doc. ## 22, 24), which are now ripe for review.

## II.  <u>Legal Standard</u>

Pursuant to 29 U.S.C. § 1132(a)(1)(B), an ERISA participant or beneficiary may bring a civil action in order to recover benefits under the terms of a benefit plan. In reviewing a benefits-denial decision, a district court operates as an appellate tribunal. <u>Crume v. Metro. Life Ins. Co.</u>, 417 F. Supp. 2d 1258, 1272 (M.D. Fla. 2006). As a result, the usual summary-judgment standards do not apply, such as whether a genuine dispute of material exists. <u>Id.</u>; <u>Leahy v. Raytheon Co.</u>, 315 F.3d 11, 18 (1st Cir. 2002); <u>Blankenship v. Metro. Life Ins. Co.</u>, 644 F.3d 1350, 1354 n.4 (11th Cir. 2011) (citing <u>Leahy</u> with approval).

"Where a plan administrator has denied a claim because of a policy exclusion, as [Hartford] did here, the burden is on the administrator to show that the exclusion prevents coverage." <u>Prelutsky v. Greater Ga. Life Ins. Co.</u>, No. 16-15900, ____ F. App'x ____, 2017 WL 2406730, at *3 (11th Cir. June 2, 2017) (internal quotation marks omitted). The

Eleventh Circuit employs a six-part framework to analyze a benefits denial:

> (1) Apply the <u>de novo</u> standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

> (2) If the administrator's decision in fact is "<u>de novo</u> wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

> (3) If the administrator's decision is "<u>de novo</u> wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

> (5) If there is no conflict, then end the inquiry and affirm the decision.

> (6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

<u>Blankenship</u>, 644 F.3d at 1354-1355.

It is undisputed that Hartford was vested with discretion. (Doc. # 24 at 3). "Therefore, even assuming that [Hartford's] decision was '<u>de novo</u> wrong' . . . the dispositive question is whether [Hartford's] decision was arbitrary and capricious." <u>Prelutsky</u>, 2017 WL 2406730, at *4. The Court will thus begin the analysis at step three. <u>Id.</u>;

<u>Till v. Lincoln Nat'l Life Ins. Co.</u>, No. 16-14799, ___ F. App'x ___, 2017 WL 393257, at *2 (11th Cir. Jan. 30, 2017).

III. **Discussion**

In this case, the relevant question is whether Hartford's reliance on the intoxication exclusion was arbitrary and capricious.[3] In particular, the Court must resolve whether Hartford possessed a reasonable basis to conclude that Frame's blood alcohol content met or exceeded the legal presumption of intoxication in Florida. <u>Prelutsky</u>, 2017 WL 2406730, at *5. For the reasons that follow, the Court holds that Hartford possessed a reasonable basis to determine that the blood alcohol test was reliable and that Plaintiff's blood alcohol content met or exceeded 0.08 gm/dL.

At the outset, Hartford argues that Frame's blood alcohol test provides a reasonable basis for Hartford's decision, notwithstanding Plaintiff's challenges to the accuracy of the test. (Doc. # 22 at 12). But as Plaintiff correctly responds (Doc. # 25 at 3-6), the cases on which Hartford relies are distinguishable because the plaintiffs raised no meaningful challenge to the blood alcohol test, at least while the claim

---

[3] The parties disagree, in passing, about whether Hartford was required to demonstrate that intoxication "caused" Frame's injury, but Plaintiff concedes that she has not raised a causation argument. (Doc. # 28 at 4-5; Doc. # 30 at 3). The Court therefore does not address the issue.

was pending before the plan administrator.[4]    Here, by contrast, Plaintiff vigorously contested the reliability of the test result during the administrative proceedings.

As plan administrator, Hartford was required to "fully investigate" Plaintiff's claim and "make a reasoned determination after a diligent investigation." Capone v. Aetna Life Ins. Co., 592 F.3d 1189, 1199-1200 (11th Cir. 2010).  The crux of Plaintiff's argument is that Hartford failed to conduct a sufficiently thorough investigation into the reliability the blood alcohol test. (Doc. # 24 at 3, 6, 13, 22; Doc. # 30 at 2).  Plaintiff's specific objections are reviewed below.

First, Plaintiff faults Hartford for failing to speak directly with the DeCanios and for failing to explain why Hartford discredited their affidavits. (Doc. # 24 at 10, 21).

---

[4] Stamp v. Metro. Life Ins. Co., 466 F. Supp. 2d 422, 426 (D.R.I. 2006) (noting, as part of background facts, that medical examiner's blood alcohol evidence provided unequivocal evidence of intoxication, where intoxication was not disputed); Sawyer v. Potash Corp. of Saskatchewan (Potashcorp), 417 F. Supp. 2d 730, 741 (E.D.N.C. 2006) (holding that coroner's blood alcohol results provided substantial evidence of intoxication where the plaintiff submitted no argument or evidence to the contrary); Veal v. Nationwide Life Ins. Co., No. 5:09-CV-356/RS/MD, 2010 WL 1380170, at *3 (N.D. Fla. Mar. 31, 2010) (deferring to toxicology report despite plaintiff's unspecified objections); Cornish v. U.S. Life Ins. Co. of City of N.Y., No. 3:06-cv-344-DW, 2009 WL 3231351, at *13 (W.D. Ky. Sept. 30, 2009) (declining to consider evidence not provided to the plan administrator regarding reliability of post-mortem blood alcohol testing).

But Hartford considered the DeCanios' affidavits, as demonstrated by the June 14, 2016, denial letter. (H113, H116-H117). And Hartford was well within its discretion to rely on objective toxicology tests over the DeCanios' statements that they observed no signs of intoxication — particularly given that the DeCanios themselves admitted that Frame consumed alcohol immediately before the accident. Capone, 592 F.3d at 1200 (holding that plan administrator was entitled to rely on toxicology tests over the affidavit of an eye witness); River v. Edward D. Jones Co., 646 F.3d 1029, 1033-34 (8th Cir. 2011) (same). Moreover, the DeCanios did not witness the crash, nor did they witness Frame's activities prior to dinner or the events between Frame's departure from the restaurant and the crash. Prelutsky, 2017 WL 2406730, at *5 (noting that plan administrator was entitled to discredit affidavit from a person who did not witness the accident).

Plaintiff also points out that Hartford did not obtain a copy of the FHP's investigation report, despite initially requesting a copy, nor did Hartford speak with Corporal Carroll or Andrus. (Doc. # 24 at 11). But Plaintiff does not explain how these alleged failings suggest a lack of diligence. Hartford possessed Andrus's investigation report, which included the FHP's findings from the accident. This is not a case in which Hartford collected "no evidence" about the relevant events and chose to instead rely on unsupported

15

inferences. <u>Cf.</u> <u>Capone</u>, 592 F.3d at 1200-1201 (observing that plan administrator conducted no investigation about circumstances leading to fatal accident, but instead relied on inferences and supposition); <u>Melech v. Life Ins. Co. of N. Am.</u>, 739 F.3d 663, 675-76 (11th Cir. 2014) (remanding to plan administrator where the claimant's file from the Social Security Administration was ignored).

Further, a plan administrator "is entitled to choose an apparently more reliable source of information." <u>Brown v. Blue Cross & Blue Shield of Ala., Inc.</u>, 898 F.2d 1556, 1572 (11th Cir. 1990), abrogated on other grounds, <u>Metro. Life Ins. Co. v. Glenn</u>, 554 U.S. 105 (2008). The FHP was responsible for investigating the crash, and the FHP had the benefit of being present at the scene. And even Plaintiff does not dispute the most salient facts: Frame was drinking shortly before the crash, and Frame's car traveled off the road despite the absence of adverse road conditions.

Plaintiff next argues that Hartford neglected to independently investigate the origin and integrity of the blood sample by contacting the Medical Examiner and SMH. (Doc. # 24 at 10-11, 17, 19). But again, Plaintiff cites no authority holding that a plan administrator is required to undertake this type of searching inquiry. To the contrary, courts routinely hold that a plan administrator may rely on a blood alcohol test without verifying chain of custody or

resolving challenges to testing methodology. See, e.g., Tran v. United of Omaha Life Ins. Co., 780 F. Supp. 2d 965, 972-74 (D. Neb. 2011) (holding that there was insufficient evidence to find that administrator abused its discretion in relying on blood test by hospital, despite plaintiff's arguments regarding the integrity of the sample and testing methodology); Arnold ex rel. Hill v. Hartford Life Ins. Co., 542 F. Supp. 2d 471, 479-80 (W.D. Va. 2008) (holding that insurer was not required to verify chain of custody and origin of sample). In this case, Hartford acted reasonably by obtaining two independent medical opinions to address the issues raised by Dr. Rose, which included objections to the integrity and origin of the blood sample.

On that front, Plaintiff raises a number of challenges to Hartford's handling of the experts. As a preliminary matter, Plaintiff challenges Dr. Tovar's qualifications pursuant to Rule 702 of the Federal Rules of Evidence and the standard set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), which govern the admissibility of expert testimony at trial. (Doc. # 30 at 6). However, Plaintiff cites no authority to support the application of Rule 702 and Daubert to an ERISA case. See Vanwright v. First Unum Life Ins. Co., 740 F. Supp. 2d 397, 404 (S.D.N.Y. 2010) ("Rule 702 and Daubert do not apply in ERISA actions."); accord Dowdy v.

Hartford Life & Acc. Ins. Co., 458 F. Supp. 2d 289, 302 n.13 (S.D. Miss. 2006) (citing cases).

Although Hartford was not required to conduct a Daubert analysis, Dr. Tovar must be competent to assess the blood alcohol test result. Helms v. Gen. Dynamics Corp., 222 F. App'x 821, 828 (11th Cir. 2007) ("We have been critical of a nurse's review when a meaningful review dictated assessment of specialized tests beyond a nurse's training.") Plaintiff notes that Tubbs specifically requested that a forensic pathologist review the blood alcohol test, but Hartford's third-party vendor assigned Dr. Tovar, a medical toxicologist rather than a forensic toxicologist. (Doc. # 24 at 10-11, 13, 16-17; see H502, H436). Plaintiff also questions what degree of experience is denoted by Dr. Tovar's "sub-specialty certificate" in medical toxicology. (Doc. # 24 at 13; Doc. # 30 at 6).

In the disability context, case law is clear that ERISA does not require a plan administrator to obtain an opinion from a physician in the same specialty as the plaintiff's physician, and Plaintiff does not suggest that a different principle would govern a claim for death benefits. Burtch v. Hartford Life & Acc. Ins. Co., 314 F. App'x 750, 753 n.3 (5th Cir. 2009) (disability appeal). Given that Dr. Tovar has training in toxicology — albeit medical toxicology rather than forensic toxicology — the Court perceives no reason why Dr.

18

Tovar would not be qualified to review a blood alcohol test and respond to Dr. Rose's specific concerns. Wakkinen v. UNUM Life Ins. Co. of Am., 531 F.3d 575, 582 (8th Cir. 2008) ("Wakkinen points to no evidence that calls into question the expertise of Dr. Jacobson personally or of a doctor who specializes in occupational medicine to offer an opinion on the condition of fibromyalgia."). If Plaintiff wished to inquire further into Dr. Tovar's training and experience, Plaintiff was entitled to conduct discovery on that issue. See, e.g., Croyle v. Prudential Ins. Co. of Am., No. 12-60684-CIV, 2012 WL 12888403, at *3 (S.D. Fla. Dec. 28, 2012) (allowing discovery on medical director's training and qualifications).

Plaintiff next argues that neither Dr. Tovar nor Hartford spoke directly with Dr. Rose. (Doc. # 24 at 10-11). Again, however, Plaintiff cites no relevant authority to support the existence of such a duty under ERISA. Cf. Turner v. Am. Airlines, Inc., No. 10-80623-CIV, 2011 WL 1542078, at *9 (S.D. Fla. Apr. 21, 2011) (in disability context, holding that ERISA does not require a plan administrator to contact a treating physician). Regardless, Dr. Tovar did attempt to speak with Dr. Rose, but Dr. Rose refused to speak with Dr. Tovar unless Plaintiff's counsel was present. (H148, H168). Hartford then instructed Dr. Tovar to communicate with Dr. Rose in writing,

which Dr. Tovar accomplished by submitting five written questions to Dr. Rose. (H148, H153-H156, H168).

Plaintiff does not dispute that written questions are a common feature of ERISA claims administration. E.g., Pini v. First Unum Life Ins. Co., 981 F. Supp. 2d 386, 395 (W.D. Pa. 2013) (noting that plan administrator sought additional information through written questions to the claimant's cardiologist). Plaintiff instead contends that the questions were "rudimentary" and only serve to bolster Plaintiff's argument that Dr. Tovar is unqualified to render an opinion on forensic toxicology.[5] (Doc. # 30 at 5; Doc. # 25 at 14-16, 18). Yet, as explained below, Dr. Rose's own opinions were primarily delivered in general and hypothetical terms. Under those circumstances, Dr. Tovar's questions were reasonable and sufficiently thorough.

Finally, Plaintiff argues that Dr. Tovar and Hartford failed to specifically address and discount each of Dr. Rose's opinions. (Doc. # 24 at 10-11, 14-21). In particular,

---

[5] The questions were: (1) Did Mr. Frame have ANY ethanol in his blood at the time of his death?; (2) Did Mr. Frame have a prohibited amount of ethanol (0.08 g/dl) at the time of his death?; (3) Did the witnesses observing Mr. Frame[']s drinking of ethanol before his death correctly observe the correct amount of ethanol that the decedent drank? Could this observation of drinking by the decedent [have] been underestimated or incorrect?; (4) Was Mr. Frame intoxicated at the time of his death?; and (5) The ethanol lab results are termed by you as unreliable. If the results were used to diagnose and treat live patients, would they then be reliable? (H154-156).

Plaintiff maintains that Dr. Tovar and Hartford failed to address, or failed to meaningfully address:

> SMH's lack of forensic accreditation;
>
> The absence of a chain-of-custody document and the missing label over the top of the blood sample tube, in violation of SMH's own policies;
>
> The Medical Examiner's failure to identify the anatomical source of the blood and whether the blood was venous or arterial;
>
> The use of grey-top tubes which are "well-known" to allow fermentation, and the presence of fermentation in the blood sample, as evidenced by the two extra volatile organic compound peaks in the chromatograms;
>
> The reliability of single-column gas chromatography testing;
>
> The removal of data from the test result, as evidenced by the notation "Small Noise Peaks Clipped," the asymmetric peak shapes and significant tailing in the chromatograms, and the absence of uncertainty values; and
>
> The potential for inaccurate post-mortem blood alcohol test results due to crash trauma, alcohol in the stomach, resuscitation efforts, fluid administration, medication administration, individual variations in ethanol absorption and elimination, the time lapse between the injury and blood collection, and other "confounding factors."

(Doc. # 24 at 14-21).

"[A] reviewing physician is not required to address every single piece of evidence produced by a claimant." Kirkpatrick v. Liberty Mut. Grp., Inc., 856 F. Supp. 2d 977, 997 (S.D. Ind. 2012); Davis v. Unum Life Ins. Co. of Am., 444 F.3d 569, 578-79 (7th Cir. 2006) ("there is nothing in ERISA or our

precedent requiring doctors to write like lawyers or plan administrators"). Dr. Tovar opined that the "[t]he methods by which the blood ethanol specimen was obtained [were] well within reasonable standard practice for medical toxicology to be able to opine on one aspect of the presence of clinical intoxication," and further, that "[t]here is no evidence that there was significant postmortem alterations of the resultant blood ethanol level such as putrefaction, incorrect sample identification, incorrect lab hardware analysis, or inappropriate location of specimen tissue areas or other interfering substances." (H170-H171). Dr. Tovar stated that "there was no evidence of significant putrefaction" because Frame was "most probably preserved via cooling soon after he was pronounced dead," which is a common practice "proven to decrease the postmortem 'auto fermentation' effect and make the observed postmortem blood tests more reliable." (H170). Those opinions adequately respond to Dr. Rose's objections regarding SMH's lack of forensic accreditation, chain of custody, the presence of fermentation, the grey-top tubes, and specimen origin.

With respect to methodology, Dr. Tovar opined that "these blood ethanol tests are also commonly used by medical toxicologists and pathologists to opine on the cause and manner of death in medical toxicology." (H170). Dr. Tovar also observed that there was "a rigid quality improvement

process on the lab method (GC/headspace) used to analyze blood specimens for the presence of ethanol and other volatile chemicals." (H171). That opinion adequately responds to Dr. Rose's criticism that SMH used single-column rather than dual-column gas chromatography.

Dr. Tovar concluded that none of Dr. Rose's stated reasons for an "extreme error" were proven to be present and that "the blood sample analysis was a trusted clinical level." (H168, H170). Presumably, Dr. Tovar referred to an "extreme error" because Dr. Rose opined that Plaintiff's blood test result should have been 0.04 gm/dL or lower, but in fact measured over three times that amount, at 0.149 gm/dL. (H1596) Dr. Tovar correctly stated that Dr. Rose failed to opine that any of issues he identified actually caused an error of that magnitude. Accordingly, Dr. Tovar's opinion adequately addresses Dr. Rose's opinions regarding the test result, including the asymmetric and tailing peaks, the clipping of small noise peaks, and the absence of uncertainty values.[6]

---

[6] Plaintiff emphasizes that the asymmetric and tailing peaks, as well as the two extra volatile organic compound peaks, are "objective" because they are apparent from the chromatogram charts. (Doc. # 24 at 16, 18). Nevertheless, Plaintiff cites no evidence to suggest that these "objective" issues produced such a substantial discrepancy in the test result. As Dr. Tovar noted, the test result "was well over the prohibited per se value" of 0.08 gm/dL. (H171).

Finally, Dr. Rose raised a number of general objections to the reliability of post-mortem blood testing, including the potential for resuscitation efforts or alcohol in the stomach to affect test results. By contrast, Dr. Tovar opined that "[t]he methods used to analyze for the quantitative presence of blood are usual and customary for both live and dead subjects . . . and most of the potential areas of concern are theoretical and unproven in post mortem studies." (H168, H170). Dr. Tovar further opined that standard resuscitation efforts have no effect on post-mortem ethanol levels and that "post mortem diffusion of ethanol from the stomach of the decedent into his venous peripheral blood is a rare and theoretical event[.]" (H168-H169). Particularly given the hypothetical nature of Dr. Rose's objections to post-mortem blood testing, Dr. Tovar adequately responded to Dr. Rose's opinion on that issue.

In a "battle of the experts," a plan administrator retains discretion to choose one expert over another. Corry v. Liberty Life Assur. Co. of Boston, 499 F.3d 389, 401 (5th Cir. 2007); accord Blankenship, 644 F.3d at 1356. Dr. Rose's 19-page opinion provided a barrage of criticisms, yet Dr. Rose tied none of those criticisms to a three-fold discrepancy in the test result. See Bickel v. Sunbelt Rentals, Inc., No. CIV.A WMN-09-2735, 2010 WL 3938348, at *4 (D. Md. Oct. 6, 2010) ("It would be highly unreasonable to conclude that the

test was so inaccurate as to report Plaintiff's blood alcohol level as more than twice the legal limit if it was, in fact, under the legal limit.")  On the other hand, Dr. Tovar opined that the Medical Examiner and SMH conducted their activities within the bounds of clinical practice, and Dr. Tovar, as an emergency room physician with toxicology training, is qualified to give such an opinion.  Although Plaintiff may prefer that the blood test result have received a forensic analysis, Plaintiff does not argue that such an analysis was required under the policy language.  Under these circumstances, Hartford reasonably adopted Dr. Tovar's opinion that the blood test was reliable.  (H120).

Plaintiff raises two additional challenges to Hartford's handling of the claim.  First, Plaintiff maintains that Tubbs violated 29 C.F.R. § 2560.503-1(h)(3), by sending Frame's file back to the claims examiner who initially denied the claim, rather than immediately performing an independent review. (Doc. # 24 at 6-9).  As Hartford points out, the cited provision applies to disability appeals.  (Doc. # 28 at 3). But regardless, the record demonstrates that Hartford acted reasonably.  According to emails and letters in the claim file, Hartford originally understood that Plaintiff was attempting to perfect her claim rather than appeal because Plaintiff submitted new evidence.  (H509-H515, H546-H549). After Plaintiff contacted Hartford to demand that the

information be independently reviewed as an appeal, Hartford treated the matter as an appeal. (H509, H513-H515).

Plaintiff also argues that Hartford's denial decision referenced the report of the first expert, Dr. Wright, despite Hartford's earlier representation that "Hartford will not be relying on this report." (Doc. # 24 at 11-12; H117, H430). However, Hartford acknowledged in the decision letter that it obtained a second opinion due to Plaintiff's concerns about Dr. Wright. (H117). And given that Dr. Wright and Dr. Tovar essentially agreed, it was reasonable for Hartford to mention Dr. Wright's opinion in its decision letter. Moreover, Hartford's decision to credit Plaintiff's concerns about Dr. Wright and to obtain a second independent opinion demonstrates Hartford's evenhandedness in reviewing Plaintiff's claim.

ERISA includes a "fundamental requirement that an administrator's decision to deny benefits must be based on a complete administrative record that is the product of a fair claim-evaluation process." Melech, 739 F.3d at 676. Hartford considered Plaintiff's evidence and obtained two independent opinions. Hartford's decision to deny benefits is supported by the blood alcohol test result and Dr. Tovar's opinion that the result is reliable. Lending further support to the reliability of the blood alcohol test result are, as Dr. Tovar noted, two undisputed facts: Frame consumed alcohol just prior to the crash, and Frame was involved in a single-car collision

26

despite the absence of adverse road conditions. (H168, H171).
Based on the collective weight of the evidence, Hartford
possessed a reasonable basis for invoking the policy's
intoxication exclusion.

In reaching this decision, the Court has considered the
structural conflict of interest present in this case, as
Hartford concedes that it "both makes eligibility decisions
and pays awarded benefits out of its own funds." (Doc. # 22
at 11); <u>Blankenship</u>, 644 F.3d at 1355. But Plaintiff raises
no argument on this issue, and the Court detects no conflict
that is of "sufficient inherent or case-specific importance."
<u>Id.</u> at 1357 (internal quotation marks omitted); <u>Prelutsky</u>,
2017 WL 2406730, at *6 (emphasizing that the plaintiff retains
the burden on this issue).

## IV. <u>Conclusion</u>

The circumstances underlying this case are undeniably
tragic. Yet, ERISA requires this Court to afford appropriate
deference to Hartford's decision. <u>Blankenship</u>, 644 F.3d at
1357. For the reasons set forth above, Hartford's decision
was not unreasonable or arbitrary and capricious. <u>Id.</u>

Accordingly, it is **ORDERED, ADJUDGED, and DECREED** that:

(1) Defendant Hartford Life and Accident Insurance
Company's Dispositive Motion for Summary Judgment (Doc. # 22)

is **GRANTED**, and Plaintiff Deborah Frame's Motion for Summary Judgment (Doc. # 24) is **DENIED**;

(2)    The Clerk is directed to enter judgment in favor of Defendant Hartford Life and Accident Insurance Company and to **CLOSE** this case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 27th day of June, 2017.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE